UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VENESSA MCDANIELS,

             Plaintiff,

     v.

GROUP HEALTH COOPERATIVE,

             Defendant.

CASE NO. C13-1689JLR

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT
ON ALL CLAIMS

     This matter comes before the court on Defendant Group Health Cooperative's

("Group Health") motion for summary judgment on all claims.  (Mot. (Dkt. # 13).)

Plaintiff Venessa McDaniels brings this action against Group Health, her former

employer, alleging a variety of claims, including race, age, and disability discrimination;

interference with her rights under the Family and Medical Leave Act ("FMLA"); breach

of contract; negligent supervision; and wrongful discharge.  (*See generally* Ver. of State

Court Rec. (Dkt. # 2) Ex. A ("Compl.").)  Having reviewed the record, the applicable

law, and the submissions of the parties, and being fully advised, the court finds there are

1  no genuine disputes of material fact and that Group Health is entitled to judgment as a

2  matter of law.  As such, the court grants Group Health's motion and enters summary

3  judgment in favor of Group Health on all of Ms. McDaniels' claims.

### I.     BACKGROUND

5          Group Health is a non-profit healthcare system headquartered in Seattle,

6  Washington.  (Wood Decl. (Dkt. # 14) ¶ 3; Compl. ¶¶ 3, 5.)  Ms. McDaniels, who is

7  African-American, began working for Group Health in January 2010 at Group Health's

8  Capitol Hill campus.  (Wood Decl. ¶¶ 3, 4; Compl. ¶¶ 4, 8.)  In October or November

9  2011, Ms. McDaniels transferred to the OB/GYN and Urology Unit at the Capitol Hill

10  campus ("the Unit"), where she worked as a Patient Access Representative ("PAR").

11  (Wood Decl. ¶ 4; Simon Decl. (Dkt. # 14) ¶ 2, Ex. 1 ("McDaniels Dep.") at 59:12-14.)

12  Group Health terminated Ms. McDaniels' employment on October 19, 2012.  (Wood

13  Decl. ¶ 27, Ex M.)

14          As a PAR, Ms. McDaniels worked in the front area of the Unit and was

15  responsible for performing a variety of administrative tasks, many of which involved

16  interacting with patients both in-person and over the phone.  (*Id.* ¶ 6, Ex. D; McDaniels

17  Dep. at 87:11-88:21.)  Like the other PARs in the Unit, Ms. McDaniels worked each shift

18  at one of six stations and rotated daily.  (Wood Decl. ¶ 7; McDaniels Dep. at 88:22-

19  90:16.)  Each station contains a desk, a computer, a keyboard, and a chair.  (Wood Decl.

20  ¶ 7; McDaniels Dep. at 90:17-22.)  Three of the stations are patient-facing, while three sit

21  behind a thin five-foot wall.  (Wood Decl. ¶ 7; McDaniels Dep. at 88:22-89:5.)  As of late

22

January 2012, Ms. McDaniels' supervisor in her position as a PAR was Corrine Wood. (Wood Decl. ¶¶ 2, 4; McDaniels Dep. at 60:5-9.)

A.     **Health Issues**

During 2012, Ms. McDaniels experienced several health-related issues that impacted her work.  In late February 2012, she submitted to Ms. Wood a letter from her primary care physician.  (Wood Decl. ¶ 28, Ex. R.)  The letter expressed a concern that Ms. McDaniels' desk was too low and requested that Group Health perform an ergonomic assessment of her workstation.  (*Id.*; McDaniels Dep. at 193:20-194:5.)  Within two days of the date of that letter, Ms. McDaniels received an email from Vicki Pasko, an Administrative Specialist for Group Health, asking Ms. McDaniels to fill out a self-assessment to prepare for a formal worksite assessment.  (Wood Decl. ¶ 28, Ex. S; McDaniels Dep. at 194:19-195:4.)

On March 19, Michael Hansen, a physical therapist at Group Health, conducted a formal ergonomic worksite assessment for Ms. McDaniels.  (Hansen Decl. (Dkt. # 16) ¶ 5, Ex. 1; Wood Decl. ¶ 29.)  Mr. Hansen recommended resolving Ms. McDaniels' issues with her workstation by moving her keyboard from the keyboard tray to the top of the desk and then raising her chair.  (Hansen Decl. ¶¶ 5-6, Ex. 1; McDaniels Dep. at 196:17-197:4.)  He did not identify any other ergonomic deficiencies.  (Hansen Decl. ¶¶ 5-8, Ex. 1; McDaniels Dep. at 197:5-8.)  In addition, Group Health permitted Ms. McDaniels to designate one chair in the PAR work area as her own.  (Wood Decl. ¶ 29; *see also* Resp. (Dkt. # 20) at 3.)

1    In April 2012, Ms. McDaniels reported problems with arthritis in her knee and

2    sought intermittent leave under the FMLA to deal with that condition.  (McDaniels Dep.

3    at 268:17-269:11.)  Group Health granted her request, designating this leave as #1120211

4    in its system.  (*Id.*; Wood Decl. ¶ 30, Ex. T.)   From March through October of 2012, Ms.

5    McDaniels took approximately 118 hours of approved FMLA leave under leave

6    #1120211.  (Wood Decl. ¶ 30, Ex. T.)

7    In June 2012, Ms. McDaniels fell at work when she attempted to sit down but

8    missed her chair.  (Wood Decl. ¶ 31; McDaniels Dep. at 201:19-202:2.)  She claims that

9    this incident caused sciatica, a condition that involves pain along the sciatic nerve in the

10   hip and thigh.  (McDaniels Dep. at 205:13-21; Webster's New World Dictionary 1202,

11   "sciatica" (3d ed. 1988).)  On June 28, Physician Assistant ("PA") Jonathan Green

12   evaluated Ms. McDaniels.  (Wood Decl. ¶ 32; Simon Decl. ¶ 4, Ex. 3 ("Green Dep.") at

13   16:5-17.)   In light of that evaluation, PA Green recommended that for two weeks Ms.

14   McDaniels take a five-minute walking break every hour.  (McDaniels Dep. at 210:2-10;

15   Green Dep. at 18:9-24; Wood Decl. ¶ 32, Ex. U.)  Group Health allowed Ms. McDaniels

16   to take these walking breaks through August 20, 2012.  (Wood Decl. ¶ 33, Ex. W; Green

17   Dep. at 31:15-25.)  PA Green also estimated that Ms. McDaniels might experience flare-

18   ups in pain once every two weeks that would require her to miss a day of work.  (Wood

19   Decl. ¶ 35, Ex. Y.)

20   In connection with her alleged sciatica, Ms. McDaniels requested intermittent

21   FMLA leave, which Group Health allowed under leave #1179780, as well as workers

22   compensation.  (*Id.*; McDaniels Dep. at 274:18-21, 276:17-277:8; Adelfio Decl. (Dkt.

# 17) ¶ 4.)  Group Health approved the majority of Ms. McDaniels' leave requests under leave #1179780 for a total of 103.75 hours of approved FMLA leave from August through October 2012.  (Wood Decl. ¶¶ 36-37, Ex. Y; Simon Decl. ¶ 10 (table of leave hours and dates).)

On several occasions, however, Group Health did not give Ms. McDaniels the leave she requested.  At least twice, Ms. McDaniels requested FMLA leave to go to massage or other medical appointments during working hours, but Group Health told her to reschedule because the Unit was already going to be short-staffed at that time. (McDaniels Decl. (Dkt. # 20-1) Ex. H.)  In addition, on two occasions, Ms. McDaniels took time off work that she labeled as FMLA leave but which Matrix, Group Health's outside leave administrator, later designated as unexcused absences.  (Wood Decl. ¶ 37, Ex. Y; McDaniels Dep. at 277:13-280:20.)  Group Health did not punish Ms. McDaniels for either of those occurrences or for any other absences from work.  (McDaniels Dep. 166:1-25; Wood Decl. ¶ 36.)

As part of managing Ms. McDaniels' workers compensation claim, Group Health attempted to confirm that Ms. McDaniels could continue to perform her current job. (Wood Decl. ¶ 33.)  To that end, Jennifer Adelfio, a risk management representative at Group Health, sent PA Green a description of the PAR job requirements along with an adjusted schedule that reflected the limitations from his evaluation.  (Adelfio Decl. ¶¶ 2, 5, 6, Ex. A.)  In response, PA Green confirmed that Ms. McDaniels could indeed work as a PAR with those limitations.  (*Id.* ¶ 6, Ex. A; Green Dep. at 20:21-21:17.)

1    Ms. Adelfio then sent a form letter to Ms. McDaniels to confirm that she would be

2    continuing at her job but with the limitations specified by PA Green.  (Adelfio Decl. ¶ 7,

3    Ex. B.)  Due to features of Group Health's automated workers compensation system, this

4    form letter referred to a "temporary job offer." [1]  (*Id.* ¶¶ 6-7, Ex. B.)  Realizing that this

5    language might give the wrong impression, Ms. Adelfio sent Ms. McDaniels and Ms.

6    Wood an email in which she explained that Ms. McDaniels was staying in her current

7    position.  (*Id.* ¶ 7.)  When Ms. McDaniels responded in a way that indicated that she

8    nevertheless thought that she was being transferred, Ms. Adelfio sent several more emails

9    reiterating that Ms. McDaniels' job was not changing and that the letter's language was

10   just a formality.  (*Id.*, Ex. C; Wood Decl. ¶ 34.)   In any event, Group Health did not

11   transfer Ms. McDaniels.  (*See* Resp. at 3-4.)

12   **B.    Discipline**

13        Ms. McDaniels' employment with Group Health was governed by Group Health's

14   human resources policies and procedures, as well as a Collective Bargaining Agreement

15   between Group Health and the Office and Professional Employees International Union

16   Local No. 8, AFL-CIO ("the Union").  (Wood Decl. ¶ 5, Exs. B, C.)  Early in her

17   employment, Ms. McDaniels underwent mandatory training on Group Health's policies,

18   including its Code of Conduct, Standards of Employee Conduct, attendance and

19   absenteeism policy, and telephone and internet use policy.  (*Id.* ¶ 9, Ex. C; McDaniels

20

21        [1] For the same reason, the correspondence between Ms. Adelfio and PA Green also used

22   this language.  (Adelfio Decl. ¶ 6, Ex. A.)

1   Dep. at 61:17-64:16.)  As a result, she understood that honesty was an expectation and

2   condition of her employment.  (McDaniels Dep. at 75:4-79:3.)  She also understood that

3   dishonesty could lead to termination under Group Health's discretionary discipline

4   policy.  (*Id.* at 72:23-73:25, 78:10-79:3.)

5       Ms. McDaniels also received two trainings on Group Health's emergency

6   response policies.  (*Id.* at 64:17:65:14, 94:3-25; Wood Decl. ¶ 11, Ex. H.)  Part of those

7   policies is a system of codes that can be called out over the facility's intercom system to

8   warn employees of different kinds of emergencies.  (Wood Decl. ¶ 10, Ex. G.)  One of

9   those codes is a "code gray."  (*Id.*)  It signifies "crisis intervention/combative person" and

10  alerts security of the need for "immediate manpower support to prevent harm to patients

11  or others."  (*Id.*)  Manuals outlining these policies and codes are located throughout the

12  Capitol Hill campus, including in the Unit.  (*Id.*)

13      During her employment with Group Health, Ms. McDaniels incurred formal

14  disciplinary action on five occasions.  (*See id.* ¶ 12, Exs. I-M.)  On March 9, 2011, she

15  received a written warning for revealing confidential patient information.  (*Id.*, Ex. I;

16  McDaniels Dep. at 95:16-96:18.)  That warning was removed from her file after three

17  months pursuant to an agreement with the Union.  (Wood Decl. ¶ 12; McDaniels Dep. at

18  97:16-23.)  Then, on March 28, 2012, she received a second written warning, this time

19  for using the phone and Internet for personal purposes during work hours.  (Wood Decl.

20  ¶ 12, Ex. J; McDaniels Dep. at 98:1-110:2.)  She received a third written warning on July

21  17, 2012, for hostile conduct toward coworkers.  (Wood Decl. ¶ 12, Ex. K; McDaniels

22  Dep. at 110:14-120:16.)  That warning was labeled as "final"; however, on October 17,

1    2012, Group Health gave her a second final written warning for recording on her

2    timesheet that she had worked during a period when she was in fact absent.  (Wood Decl.

3    ¶ 12, Exs. K, L; McDaniels Dep. at 110:14-111:19, 123:23-128:10.)  In each of the latter

4    three incidents, Ms. McDaniels' dishonesty regarding the incident aggravated the

5    underlying misconduct.  (Wood Decl. ¶ 12, Exs. J-L; McDaniels Dep. at 98:1-100:16,

6    118:16-120:1, 125:5-126:20.)

7          The fifth incident occurred on October 12, 2012, a week before Group Health

8    terminated Ms. McDaniels' employment.  (Wood Decl. Ex. M; McDaniels Dep. at 135:2-

9    9.)  On that day, Ms. McDaniels was working at a non-patient-facing workstation behind

10   the short wall in the Unit.  (Wood Decl. Ex. N; McDaniels Dep. at 143:20-24.)  Around

11   3:00 p.m., Terrie Timmers, one of her co-workers who was working in front of the wall,

12   informed Ms. McDaniels that a man wanted to see her.  (Wood Decl. Ex. N; McDaniels

13   Dep. at 143:20-24.)  When Ms. McDaniels asked who it was, Ms. Timmers went back to

14   check.  (Wood Decl. Ex. N; McDaniels Dep. at 143:20-144:6.)  She returned to tell Ms.

15   McDaniels that the man was a process server waiting to serve papers on Ms. McDaniels.

16   (Wood Decl. Ex. N; McDaniels Dep. at 144:7-9.)

17         At that time, Ms. McDaniels was involved in a dispute with her homeowners

18   association regarding dues that Ms. McDaniels allegedly owed to the association.

19   (McDaniels Dep. at 135:2-18.)  Apparently, she had been served with papers at her home

20   already and did not want to be served at work.  (*Id.* at 142:14-143:1, 146:11-147:8; Wood

21   Decl. Ex. N.)  After conferring with Ms. McDaniels, Ms. Timmers told the process server

22   that Ms. McDaniels was not there.  (Wood Decl. Ex. N; McDaniels Dep. at 144:7-15.)

1   The process server replied that he would wait.  (Wood Decl. Ex. N; McDaniels Dep. at

2   144:12-16.)  Ms. McDaniels overheard that remark and got up from her desk and left.

3   (Wood Decl. Ex. N.)

4          Shortly thereafter, Ms. McDaniels called the operator at Group Health.  (*Id.*;

5   McDaniels Dep. at 144:17-145:1.)  She told the operator that there was a man in the Unit

6   who was harassing an employee.  (McDaniels Dep. at 136:17-139:18; Wood Decl. ¶¶ 18-

7   19.)  When the operator asked if Ms. McDaniels was calling a code, she hesitated,

8   possibly not understanding what a code was.  (McDaniels Dep. at 137:16-138:12.)  She

9   then stated that security needed to come remove the man from the building.  (*Id.* at

10  138:12-14.)  The operator asked if this meant that she wanted a code gray.  (*Id.* at 138:15-

11  16.)  Ms. McDaniels responded that she did, and the operator called a code gray

12  throughout the facility.  (*Id.* at 138:17-139:18; Wood Decl. ¶ 16, Exs. M, N.)  When

13  security arrived, they found no hostile or threatening persons.  (Wood Decl. ¶ 17, Ex. O.)

14  Eventually they ascertained that Ms. McDaniels had called regarding the process server,

15  who had been sitting quietly in the waiting room.  (*Id.* ¶¶ 17, 21, Exs. N, O.)

16         The code gray had a substantial disruptive effect.  (*Id.* ¶ 25, Ex. M.)  On that day,

17  doctors in the Unit were performing abortions; and as such, a warning about a hostile

18  person in the Unit was particularly disconcerting to staff members.  (*Id.* ¶¶ 15, 21, 25,

19  Exs. M, N.)  Additionally, several security guards responded and spent approximately

20  thirty minutes dealing with the incident.  (*Id.* ¶¶ 16, 25, Exs. M, O.)

21         In the investigations that followed the code gray, Ms. McDaniels changed her

22  version of events multiple times.  Initially, she told the security guards that the process

1  server had raised his voice to her.  (*Id.* ¶ 18, Exs. M, O; McDaniels Dep. at 147:9-20.)

2  Later, in an investigatory meeting, she told Ms. Wood and several other Group Health

3  officials that the security guards were lying about what she had said.  (Wood Decl. ¶ 23,

4  Ex. P.)  At that point, she explained that she called the code gray simply to preempt a

5  screaming episode between her and the process server.  (*Id.*)  Later in that meeting she

6  changed her story yet again, claiming that she had overheard the process server threaten

7  to search for her in the back room.  (Wood Decl. ¶ 23.)  Ms. McDaniels now admits that

8  she never spoke to the process server or witnessed him being hostile or threatening to

9  anyone.  (McDaniels Dep. at 140:13-143:21, 145:10-148:21.)

10       As part of the investigation into the code gray episode, Ms. Wood also interviewed

11  three other PARs and Ms. Timmers, all of whom were working nearby when the incident

12  occurred.  (Wood Decl. ¶ 21, Exs. N, O.)  Their stories, along with the security guards'

13  report, were all consistent with each other but inconsistent with the accounts of the

14  incident that Ms. McDaniels had given thus far.  (*See id.*)  Two days after the

15  investigatory meeting with Ms. McDaniels, Group Health mailed her a notice of

16  termination.  (*Id.* ¶¶ 23, 27, Ex. M.)

17  **C.    The Dispute**

18       In late July or early August of 2012, Ms. McDaniels filed joint charges with the

19  Equal Opportunity Employment Commission ("EEOC") and the Washington State

20  Human Rights Commission ("WSHRC") in which she alleged that Group Health

21  discriminated against her on the basis of her race and disability.  (Simon Decl. ¶ 7, Ex. 6.)

22  On October 26, 2012, the WSHRC issued a no reasonable cause finding (*id.*), and the

EEOC adopted that finding and issued a dismissal and notice of rights on January 16, 2013 (*id.*). However, on March 21, 2013, the WSHRC reopened the case (*id.*), and on April 15, 2013, the EEOC rescinded the dismissal and notice of rights (*id.*). [2] Shortly after she was terminated, Ms. McDaniels filed another charge with the EEOC, this time alleging discrimination on the basis of her race, disability, and age. (*Id.* ¶ 8, Ex. 7.) The EEOC issued a dismissal and notice of rights as to that charge on May 3, 2013 (*id.*), and Ms. McDaniels filed this suit on July 13, 2013 (*see generally* Ver. of State Court Rec.).

In her complaint, Ms. McDaniels asserts a variety of statutory and common law claims against Group Health. The thrust of those claims is that Group Health disciplined her unfairly because of her race and age; interfered with her rights to medical leave; and failed to provide her with a reasonable accommodation for her disability. (*See generally* Compl.; Resp.) She also nominally asserts claims for age discrimination, negligent supervision, breach of contract, and wrongful discharge. (*See generally* Compl; Resp.)

Group Health counters that it disciplined and eventually terminated Ms. McDaniels due to a pattern of policy violations and dishonesty that culminated in the incident involving the false code gray. (*See generally* Mot.; Reply.) Furthermore, Group Health contends that it reasonably accommodated Ms. McDaniels' disability and denied her medical leave requests in a way that was appropriate or at least non-prejudicial. (*See*

---

[2] Because these administrative charges are apparently still pending, it appears that Ms. McDaniels may have failed to exhaust her administrative remedies with respect to several of her claims. Group Health has brought this issue to the court's attention (*see* Mot. at 24 n.4), but devotes the relevant portions of its motion to attacking the substance of the apparently unexhausted claims. (*See generally* Mot.) Accordingly, the court will address the substance of all of Ms. McDaniels' claims.

1  *generally* Mot.; Reply.)  Finally, Group Health argues that Ms. McDaniels' nominally

2  asserted claims are entirely lacking in merit and factual basis.  (*See generally* Mot.;

3  Reply.)

## II.     DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most

favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

there is no genuine issue of material fact and that he or she is entitled to prevail as a

matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the

non-moving party "must make a showing sufficient to establish a genuine dispute of

material fact regarding the existence of the essential elements of his case that he must

prove at trial." *Galen*, 477 F.3d at 658.  The court is "required to view the facts and draw

reasonable inferences in the light most favorable to the [non-moving] party." *Scott v.

Harris*, 550 U.S. 372, 378 (2007).

Here, Ms. McDaniels has the burden of proof at trial on all of her claims;

therefore, Group Health need not make an affirmative showing negating her case before

summary judgment is appropriate.  Instead, Group Health can show that there are no

genuine issues of material fact simply by showing that there is no evidence to support

Ms. McDaniels' various claims.  *Celotex*, 477 U.S. at 325.  Furthermore, Rule 56(c)

provides that a party asserting the presence or absence of a disputed fact must support

that assertion by "citing to particular parts of materials in the record."  Fed. R. Civ. P.

56(c)(1)(A).  In addition, the court "need consider only the cited materials," Fed. R. Civ.

P. 56(c)(3), and may take as "undisputed for purposes of the motion" any fact not

properly contested or supported, Fed. R. Civ. P. 56(e)(2).  These rules have particular

relevance here because Ms. McDaniels has declined to include a fact section in her

response brief and has provided almost no citations to specific parts of materials in the

record.  (*See generally* Resp.)

**B.    Group Health Is Entitled to Judgment as a Matter of Law on All of Ms. McDaniels' Claims.**

The court has struggled to interpret Ms. McDaniels' poorly articulated filings;

however, the court has concluded that she is asserting seven types of claims:  (1) race

discrimination in violation of the Washington Law Against Discrimination ("WLAD")

and Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) failure to accommodate

her disability in violation of the Americans with Disabilities Act ("ADA") and the

WLAD; (3) interference with her rights under the Family and Medical Leave Act

("FMLA"); (4) age discrimination in violation of the WLAD; (5) negligent supervision;

(6) breach of contract; and (7) wrongful discharge.  As set forth below, Ms. McDaniel has

failed to create a genuine issue of material fact on any of these claims, and Group Health

is entitled to judgment as a matter of law on all of them.

1       1.  <u>Race Discrimination under the WLAD and Title VII</u>

2      Ms. McDaniels appears to assert a disparate treatment claim and a hostile work

3 environment claim based on three instances of discipline, one of which resulted in

4 termination.  (*See* Compl. ¶¶ 8-10, 23; Resp. at 6.)  She claims that Group Health

5 disciplined her more harshly than it did similarly situated Caucasian employees and also

6 that this uneven discipline created a hostile working environment.  (Compl. ¶¶ 8-10, 23;

7 Resp. at 6.)  Neither of these claims can survive summary judgment, because Ms.

8 McDaniels cannot make out a prima facie case for either of them

9       a.  *Disparate Treatment*

10     Courts generally use a burden shifting approach to evaluate Title VII disparate

11 treatment claims at the summary judgment stage.[3]  *Cornwell v. Electra Cent. Credit*

12 *Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*,

13 411 U.S. 792, 802 (1973)).  According to this approach, the plaintiff-employee has the

14 initial burden to establish a prima facie case of discrimination.  *Id.*  If the plaintiff

15 succeeds in making out a prima facie case, a presumption of discrimination arises, and

16 the burden shifts to the defendant to articulate a legitimate non-discriminatory rationale

17 ("LNR") for the challenged action.  *Id.*  Once the defendant comes forward with a LNR,

18 the presumption of discrimination disappears and the burden shifts back to the plaintiff to

19 demonstrate that the defendant's LNR is a mere pretext for discrimination.  *Id.*  At this

20    ————————————

21      [3] Washington courts use substantially the same framework when evaluating WLAD
claims.  *See Hill v. BCTI Income Fund-I*, 23 P.3d 440, 445-46 (Wash. 2001) (en banc), *overruled*

22 *on other grounds by McClarty v. Totem Elec.*, 137 P.3d 844 (Wash. 2006).

final stage, the plaintiff must come forward with enough evidence for a reasonable jury to conclude by a preponderance of the evidence that "the defendant undertook the challenged employment action because of the plaintiff's race." *Id.*

To establish a prima facie case of disparate treatment, a plaintiff must show that (1) she is a member of a protected class; (2) she performed her job satisfactorily, was qualified, and met the legitimate expectations of her employer; (3) she suffered an adverse employment action; and (4) the defendant-employer treated her differently from a similarly situated employee who does not belong to the same protected class. *See id.* As an alternative to comparator evidence, the plaintiff can provide evidence of "other circumstances surrounding the adverse employment action [that] give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Ms. McDaniels provides insufficient evidence to raise an inference of discrimination; therefore, her claim fails on the fourth prong of the prima facie case.

At least in the context of this motion, Ms. McDaniels meets the first three prongs of a prima facie case for disparate impact. She is African-American and a member of a protected class on the basis of her race. (*See* Compl. ¶ 8.) For the purposes of this motion, the court assumes without deciding that she was performing her job adequately.[4]

_____

[4] Group Health argues that Ms. McDaniels was not performing her job adequately. (*See* Mot. at 22.) Indeed, it would seem strange to say that she was performing adequately when she admits to having violated Group Health policy. (*See, e.g.*, McDaniels Dep. at 147:9-20.) However, the thrust of Ms. McDaniels' claim seems to be that while she committed some misconduct, Group Health punished her more harshly for that conduct because of her race. (*See* Resp. at 6.) Given that claim, adequate job performance takes on a somewhat specialized meaning—it encompasses the misconduct that Ms. McDaniels committed. Under this

1    Regarding the third prong, she cites three instances of disciplinary action as "adverse

2    employment actions."[5]  These three incidents are (1) her March 2011 written warning for

3    violating patient confidentiality; (2) her March 2012 written warning for violating the

4    phone and internet use policy and for dishonesty during the investigation; and (3) her

5    October 2012 termination for causing a code gray to issue under false pretenses and for

6    dishonesty during the investigation.  (*See* Resp. at 6; McDaniels Dep. at 226:2-14; *supra*

7    § I.B.)  She seems to argue that on these three occasions Group Health disciplined her, or

8    at least disciplined her more harshly, because she is African-American.  (*See* Resp. at 6.)

9    Her prima facie case cannot succeed, however, because she has failed to create a genuine

10   issue of fact that Group Health treated her differently because of her race.

11        To raise an inference of discrimination, the plaintiff must be able to point to either

12   (a) one or more valid comparators, or (b) other circumstances surrounding the adverse

13   action that create an inference of discrimination.  *See Peterson*, 358 F.3d at 603.  Valid

14   comparators must be similar to the plaintiff "in all material respects."  *Moran v. Selig*,

15   447 F.3d 748, 755 (9th Cir. 2006) (citing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-

16   54 (2d Cir. 2001)).  Although material characteristics vary from case to case, in

17   _____

18   interpretation of her argument, Ms. McDaniels performed just as adequately as her Caucasian
     colleagues who engaged in similar conduct; and the discrimination lies in the fact that she was
19   written up and then fired for that conduct while they were not.  Having interpreted her claim in
     this way, the court finds it more useful to focus the analysis on whether Ms. McDaniels has met
20   prong four.

21        [5] The court acknowledges that Group Health disputes whether all of these incidents
     qualify as adverse employment actions.  (*See* Mot. at 22 n.1.)  For the purposes of this order, the
22   court assumes without deciding that Ms. McDaniels was subject to an adverse employment
     action on these three occasions.

termination and discipline cases, the Ninth Circuit looks to factors such as whether the proposed comparator and the plaintiff were subject to the same policies, worked at the same jobs, committed similar violations, and had similar disciplinary records.  *See, e.g.*, *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2010) (similar jobs and similar type and severity of misconduct); *Wall v. Nat'l R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (similar conduct and disciplinary records); *see also Collins v. Potter*, 431 Fed. App'x 599, 600 (9th Cir. 2011) (finding proposed comparator insufficiently similar because she was not subject to a "Last Chance Employment Agreement" and had no record of dishonesty or insubordination).

Ms. McDaniels attempts to raise an inference of discrimination using comparators—that is, by pointing to instances where Caucasian employees allegedly received lesser punishments for similar violations of Group Health policy.  (*See* Compl. ¶ 9; Resp. at 6.)  In particular, she points to (1) Norma Schlegel, a white PAR who inappropriately disclosed patient information and received a verbal warning[6] and a recommendation for further training;[7] (2) Eric Madsen, a white employee who violated Group Health's internet use policy and received a verbal warning with an accompanying

---

[6] This is the parties' term.  The court interprets "verbal" in this context as meaning spoken rather than written.

[7] Ms. McDaniels received a written warning for disclosing patient information.  That warning was removed from her file pursuant to a union settlement.  (*See* Wood Decl. ¶ 12; McDaniels Dep. at 97:16-23.)

ORDER- 17

1  written record of the warning;[8] and (3) an email suggesting that another employee might

2  have initiated a false code gray on a different occasion.[9]  (*See* Resp. at 6.)

3  　　　　The problem with each of these proposed comparators, however, is that they are

4  not similar to Ms. McDaniels in all material respects.  *See Moran*, 447 F.3d at 755.  Ms.

5  Schlegel's disclosure of patient information occurred under circumstances that mitigated

6  its seriousness—she disclosed a patient's middle initial to a uniformed police officer

7  while trying to assist an investigation, and after she realized her mistake, she came in

8  immediately on her day off to self-report.  (*See* Wood Decl. ¶ 39, Ex. AA.)  Ms.

9  McDaniel's violation came to light only when her supervisor received notice of a security

10 breach.[10]  (*See id.* ¶ 39); *Vasquez*, 349 F.3d at 641.  Moreover, Ms. Schlegel worked in a

11 different department and for a different supervisor.  (*See* McDaniels Dep. at 229:13-

12 230:18.)  Mr. Madsen is distinct from Ms. McDaniels in two material respects.  Unlike

13 Ms. McDaniels, he violated only the internet policy, not the phone policy as well, and he

14 did not lie during the investigation of his misconduct.  (*See* Simon Decl. ¶ 9, Ex. 8; Mot.

15 at 22-23); *Vasquez*, 349 F.3d at 641; *Collins*, 431 Fed. App'x at 600.  Ms. McDaniels has

16

17 _____

18 　　　[8] Ms. McDaniels received a written warning for violating Group Health's phone and
   internet policy and then lying about it.  (*See* Wood Decl. ¶ 12.)

19

20 　　　[9] Group Health fired Ms. McDaniels after her code gray incident.  (*See* Wood Decl. ¶ 12.)

21 　　　[10] As mentioned above, the documents pertaining to this incident were removed from Ms.
   McDaniels' personnel file.  Ms. McDaniels has not provided the court with any of those
   documents or explained the circumstances surrounding her disclosure of patient information.
   Consequently, the court is unaware of any facts that might render Ms. McDaniels' situation more
22 comparable to Ms. Schlegel's.

1   not disputed any of these distinctions.  Accordingly, neither of these proposed

2   comparators is sufficiently similar to Ms. McDaniels.

3          Ms. McDaniels' third proposed comparator fares even worse.  Ms. McDaniels

4   claims that "another Group Health employee, who was white, called a false code gray and

5   she received no discipline."  (Resp. at 6.)  As evidence of this she produces a single

6   email, addressed to multiple addressees, which reads, "A code gray was called today, and

7   apparently it became obvious that we ALL need to aware of what this means.  Please DO

8   NOT call the operator to ask what this means."  (McDaniels Decl. Ex. D.)  Although this

9   email suggests that an unwarranted code gray may have occurred, the email fails to

10  disclose numerous facts necessary to determining whether a valid comparator exists.  For

11  instance, the email says nothing about who initiated the code gray, what that person's

12  race is, whether that person was mistaken or intended to mislead, whether that person lied

13  in the subsequent investigation, and what kind of disciplinary record that person had at

14  the time.  (*Cf.* Wood Decl. ¶¶ 22-27, Ex. M (explaining Group Health's asserted reasons

15  for firing Ms. McDaniels).)  It also does not show that the responsible party "received no

16  discipline," as Ms. McDaniels claims.  (*See* Resp. at 6.)  As such, Ms. McDaniels has

17  failed to create a genuine issue of fact with respect to the existence of valid comparators.

18         Moreover, Ms. McDaniels fails to provide evidence of "other circumstances"

19  surrounding her adverse employment actions that might raise an inference of

20  discrimination.  *See Peterson*, 358. F.3d at 603.  In her response motion, she asserts that

21  the code gray was warranted.  (Resp. at 6.)  Yet she provides no evidence to support that

22  assertion, and her own deposition testimony contradicts it (*see* McDaniels Dep. at

ORDER- 19

144:17-145:9, 147:9-149:4), as does considerable evidence from Group Health's internal

investigation (*see* Wood Decl. ¶¶ 13-24, Exs. N-P).  Furthermore, Ms. McDaniels does

not dispute that she was dishonest during the code gray episode, (*see* McDaniels Dep. at

147:9-148:21), or that her dishonesty played a significant role in the decision to terminate

her (*see* Wood Decl. ¶¶ 26-27, Ex. M).  In view of her inability to raise an inference of

discrimination, she cannot make out a prima facie case of disparate treatment on the basis

of her race.

Furthermore, even if the court overlooked the deficiencies in Ms. McDaniels'

prima facie case, Ms. McDaniels' disparate treatment claim would still fail.  Group

Health has offered a compelling LNR—namely, that it disciplined and ultimately

terminated Ms. McDaniels due to a documented pattern of policy violations and

dishonesty.  (*See, e.g.*, Mot. at 23; Wood Decl. ¶¶ 26-27, Ex. M.)  That would shift the

burden back to Ms. McDaniels to provide "specific and substantial evidence" of

discrimination.  *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir.

1996).  Conclusory allegations, speculation, and unsupported assertions would be

insufficient.  *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003);

*Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1082-83 (9th Cir. 1996).

However, Ms. McDaniels' only argument linking Group Health's conduct to her

race is the same insufficient comparator evidence, her unsupported assertion that the code

gray was warranted, and her "gut feeling" that race played a role.  (*See* Resp. at 6;

McDaniels Dep. at 231:9-19.)  Group Health, on the other hand, has amassed in support

of its LNR considerable evidence of Ms. McDaniels' misconduct (*see, e.g.*, Mot. at 23;

1    Wood Decl. ¶¶ 12-24, Exs. J-O), almost none of which Ms. McDaniels disputes.  Even

2    drawing all inferences in favor of Ms. McDaniels, no reasonable jury could conclude by a

3    preponderance of the evidence that race motivated Group Health's decisions to discipline

4    and eventually terminate her.  Therefore, Group Health is entitled to summary judgment

5    on Ms. McDaniels' disparate treatment race discrimination claim.

6             *b.  Hostile Work Environment*

7             To state a claim for hostile work environment on the basis of race, a plaintiff must

8    show that (1) she was subjected to verbal or physical conduct directed at her because of

9    her race; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or

10   pervasive to alter the conditions of employment and create an abusive working

11   environment.  *See Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003).

12            Ms. McDaniels cannot meet even the first prong of a prima facie case of hostile

13   work environment.  The entirety of Ms. McDaniels' submissions regarding this claim

14   consists of two conclusory statements in her complaint.[11]  These statements seem to link

15   the alleged hostile environment to the same instances of discipline that form the basis of

16   her disparate treatment claim.  However, as discussed above with reference to her

17   disparate treatment claim, Ms. McDaniels has failed to create a genuine issue of material

18   fact regarding whether Group Health disciplined her because of her race.  That failure

19

20            [11] Those statements are as follows: (1) Group Health supervisors and employees
     conspired to "discipline Ms. McDaniels in a way that violated Group Health's disciplinary
     policies and subjected Ms. McDaniels to a hostile work environment . . . due to Ms.

21   McDaniels['] race . . . ." (2) "Defendants have intentionally . . . discriminated against the
     plaintiff on account of her race . . . by creating and maintaining a racially pervasive and

22   discriminatory work environment which perpetuated the discriminatory treatment of the plaintiff
     . . . ." (Compl. ¶¶ 10, 23.)

1   also defeats a hostile work environment claim premised on the same instances of

2   discipline.

3       2.   Failure to Accommodate Disability Discrimination under the ADA and the
            WLAD

4   Ms. McDaniels claims that Group Health violated the ADA and the WLAD by

5   refusing to reasonably accommodate her disabilities.  (Compl. ¶ 7; Resp. at  3-4.)  She

6   admits that Group Health did not fire her because of her disabilities (*see* McDaniels Dep.

7   at 222:23-223:4), and that Group Health made some accommodations, such as removing

8   cords from under her desk, allowing her to designate one chair in a shared workspace as

9   her own, and permitting her to stand up from her desk and walk around for five minutes

10  of every hour (*see Resp.* at 3; *see also* Adelfio Decl. ¶ 4; Wood Decl. ¶¶ 28, 29, 33).

11  Nevertheless, she asserts that Group Health could have done more and therefore failed to

12  reasonably accommodate her.  (*See* Resp. at 3-4.)  Ms. McDaniels' accommodation claim

13  cannot survive summary judgment under either the ADA or the WLAD.

14  Judicial interpretations of the ADA and the WLAD differ slightly in the way they

15  phrase the elements of an accommodation claim under the two statutes, but the basic

16  requirements are essentially the same.  Both statutes require the plaintiff to show that (1)

17  she is disabled; (2) she is qualified for the job in question and capable of performing it

18  with reasonable accommodation; (3) the employer had notice of her disability; and (4) the

19  employer failed to reasonably accommodate her disability.  *See Samper v. Providence St.*

20  *Vincent Med. Cntr.*, 675 F.3d 1233, 1237 (9th Cir. 2012); *Zivkovic v. S. Cal. Edison Co.*,

21  302 F.3d 1080, 1088-89 (9th Cir. 2002); *Davis v. Microsoft Corp.*, 70 P.3d 126, 131

22

1 (Wash. 2003).  Group Health concedes for purposes of this motion that Ms. McDaniels is

2 disabled under the WLAD and the ADA (*see* Mot. at 27 n.7), and the parties do not

3 dispute prongs two and three.  Rather, Group Health contends, and the court agrees, that

4 Ms. McDaniels fails to create a genuine issue of material fact with respect to prong four.

5      Neither the ADA nor the WLAD requires an employer "to offer the employee the

6 precise accommodation he or she requests."  *Doe v. Boeing Co.*, 846 P.2d 531, 538

7 (Wash. 1993); *Zivkovic*, 302 F.3d at 1089.  The employer need only provide enough

8 accommodation to enable the employee to perform the essential functions of his job.  *See*

9 *Dark v. Curry Cnty.*, 451 F.2d 1078, 1089 (9th Cir. 2006); *Doe*, 846 P.2d at 537.  To

10 prevail on an accommodation claim, the plaintiff-employee must have requested an

11 accommodation, unless the need for one was obvious, *see Zivkovic*, 302 F.3d at 1089, and

12 must "show[] the reasonableness of an accommodation," *see  Giebeler v. M & B Assocs.*,

13 343 F.3d 1143, 1156 (9th Cir. 2003) (citing *U.S. Airways v. Barnett*, 535 U.S. 391, 401-

14 02 (2002)).  Moreover, the plaintiff must make some showing that she required an

15 accommodation to perform the essential functions of her job on equal terms with non-

16 disabled employees.  *See Jura v. Cnty. of Maui*, No. 11-00338 SOM/RLP, 2012 WL

17 5187845, at *9-10 (D. Haw. Oct. 17, 2012), *aff'd* ---Fed. App'x---, 2014 WL 3338847

18 (9th Cir. 2014); *see also Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 934-35 (Wash. 2004)

19 (explaining that WLAD plaintiffs must prove the accommodation is medically

20 necessary).

21      Ms. McDaniels devotes her briefing to arguing that Group Health could have

22 transferred her to another job but inexplicably withdrew its transfer offer.  (*See* Resp. at

1    3-4.)  She claims that this shows Group Health's failure to reasonably accommodate her

2    disabilities.  (*Id.* at 4.)  Yet the undisputed facts reveal that Group Health did not offer to

3    transfer Ms. McDaniels.[12]  (Adelfio Decl. ¶ 7, Ex. C; Wood Decl. ¶ 34.)  Furthermore,

4    Ms. McDaniels cites to no evidence that she even requested a transfer.  Nor does she

5    make any showing that Group Health's existing accommodations were inadequate or that

6    a transfer—or any other additional accommodation—would've been reasonable.  Group

7    Health, on the other hand, offers substantial undisputed evidence of its efforts to

8    accommodate Ms. McDaniels' disabilities.  (*See generally* Mot. at 27-28; *see also supra*

9    § I.A.)  Consequently, Ms. McDaniels has not created a genuine issue of material fact

10   regarding whether Group Health failed to reasonably accommodate her disabilities.  The

11   court therefore grants summary judgment in Group Health's favor on Ms. McDaniels'

12   accommodation claim.

13

14

15

16

17   _____

        [12] In support of her position, Ms. McDaniels points to a letter she received from Ms.
18   Adelfio on July 25, 2012, and the correspondence between Ms. Adelfio and PA Green.  (Adelfio
     Decl. Exs. A, B.)  Group Health argues that these documents do not demonstrate that it offered
19   her a transfer.  (Resp. at 28 n.8; Reply at 12-13.)  To support its position, Group Health cites a
     string of explanatory emails that accompanied the letter.  (Adelfio Decl. ¶ 7, Ex. C.)  Those
20   emails explained to Ms. McDaniels that Group Health was not offering her a new job and that
     the "job offer" language was just a formality.  (*Id.*)  Ms. McDaniels does not dispute any of that
21   evidence or explain how it fails to show that Group Health did not offer her another position.
     Thus, the court concludes that Ms. McDaniels fails to raise a genuine issue of material fact on
22   this point.

ORDER- 24

### 3.  FMLA Interference

Ms. McDaniels claims that Group Health interfered[13] with her rights under the FMLA by denying her leave to which she was entitled in two sets of circumstances.[14] First, she asserts that Group Health refused on several occasions to give her time off for medical appointments.  (*See* Compl. ¶¶ 25-28; McDaniels Decl. Ex. H.)  Second, she contends that Group Health twice wrongfully failed to count medical appointments as FMLA leave.  (*See* Compl. ¶¶ 25-28; McDaniels Dep. at 278:10-279:8.)  Ms. McDaniels' FMLA claim cannot survive summary judgment on either basis.

To prevail on a FMLA interference claim, an employee must establish that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (internal quotation marks

---

[13] In her complaint, Ms. McDaniels characterizes her FMLA claim as one for both interference and retaliation.  She describes the retaliation aspect of her claim as follows:  "Group Health also retaliated against Ms. McDaniels when she attempted to exercise . . . her FMLA rights by counting FMLA leave against the firm's absentee policy for disciplinary purposes and by disciplining the Plaintiff for using her approved FMLA."  (Compl. ¶ 12.)  Later, in her response motion, Ms. McDaniels seems to recast her FMLA claim as one for interference only, apparently realizing that the type of conduct she describes in her complaint qualifies as FMLA interference, not retaliation, under Ninth Circuit law.  *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1135-36 (9th Cir. 2003); (Resp. at 7-8).  The court, therefore, will treat Ms. McDaniels' FMLA claim as one for interference only.

[14] In her complaint, Ms. McDaniels also alleges that Group Health disciplined her for taking FMLA leave (Compl. ¶ 12); however, as Group Health points out, she has failed to provide any factual support or further argument on this point (Mot. at 26).  As such, the court finds there is no genuine dispute of material fact regarding this part of Ms. McDaniels' FMLA claim.  The following discussion, therefore, will deal only with Ms. McDaniels' claim that Group improperly denied her FMLA leave.

1   omitted).  The parties do not contest elements one through three; however, they disagree

2   about elements four and five.

3          When evaluating the final two elements of the above test, the court must bear in

4   mind that Congress intended the FMLA to serve as an accommodation of the needs of

5   both employees and their employers.  *See* 29 U.S.C. § 2601(b) (reciting the purposes of

6   the FMLA).  In furtherance of that goal, the FMLA gives employees significant rights but

7   also imposes on them some obligations designed to accommodate the legitimate business

8   concerns of employers.  Thus, if an employee's need for leave is foreseeable based on

9   planned medical treatment, the employee must provide notice to the employer and "make

10  a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of

11  the employer."  29 U.S.C. § 2612(e)(2) (this requirement is subject to the approval of the

12  employee's healthcare provider); *see also* 29 C.F.R. §§ 825.117, 302 (accord)

13  (Department of Labor Regulations for the FMLA).[15]  Furthermore, in order for an

14  employee to obtain relief under the FMLA, the asserted violation must result in prejudice

15  to the employee.  *See Ragsdale v. Wolverine Worldwide, Inc.*, 535 U.S. 81, 89 (2002).

16         Insofar as her FMLA claim depends on Group Health's refusal to approve certain

17  leave requests, Ms. McDaniels has failed to create a genuine issue of material fact about

18  whether she made reasonable efforts to accommodate Group Health's legitimate

19

---

20         [15] Congress authorized the Department of Labor to issue implementing regulations for the

21  FMLA.  *See* 29 U.S.C. § 2654.  "These regulations are entitled to deference under C*hevron USA,
    Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984)."  *Xin Liu*, 347

22  F.3d at 1133.

operational needs.  Ms. McDaniels does not contest that Group Health granted the vast

majority of her requests for leave.[16]  In fact, she has specifically identified only two

instances when Group Health refused her leave requests.[17]  (*See* McDaniels Decl. Ex. H.)

Group Health contends that on these occasions it requested that Ms. McDaniels

reschedule her appointments because the Unit was already going to be understaffed at the

time she requested.  (*See* Wood Decl. ¶ 38; *see also* McDaniels Decl. Ex. H.)  Ms.

McDaniels has produced no evidence to show that this operational concern was

unjustified or unreasonable.  Nor has she provided any evidence to show that

rescheduling those appointments was unreasonably burdensome or contrary to the advice

or recommendations of her healthcare provider.  Consequently, Ms. McDaniels' FMLA

claims cannot survive on the basis of these two instances.

Ms. McDaniels also cannot rely on Group Health's failure to count two absences

as FMLA leave.  In both cases, Group Health's leave administrator, Matrix, designated

the absence as non-FMLA after Ms. McDaniels had already taken the time off.

(McDaniels Dep. at 277:13-280:17; Wood Decl. ¶ 37.)  Group Health contends that those

absences entailed no adverse consequences for Ms. McDaniels (*see* Mot. at 26), and Ms.

McDaniels offers no evidence to show that she suffered any harm as a result of Group

Health's alleged error.  In fact, she admitted in her deposition that Group Health never

---

[16] From March through October, Group Health approved more than 220 hours of intermittent FMLA leave for Ms. McDaniels.  (*See* Wood Decl. ¶¶ 30, 36, 37, Ex. Y; Simon Decl. ¶ 10 (table of leave hours and dates).)

[17] One was for four hours; the other was for eight hours.  (*See* Wood Decl. ¶ 37.)

disciplined her for absenteeism.  (*See* McDaniels Dep. at 166:1-25, 290:19-292:3.)  Thus,

even if Group Health should have counted these absences as FMLA leave, Ms.

McDaniels suffered no prejudice as a result of Group Health's mistake.  *See Ragsdale*,

535 U.S. at 89.  Accordingly, Group Health is entitled to summary judgment on Ms.

McDaniels' FMLA interference claim.

### 4.  Age Discrimination under the WLAD

Ms. McDaniels' age discrimination claim appears in her submissions to this court

only in headings.  In her complaint, she labels her third cause of action

"DISCRIMINATION ON THE BASIS OF RACE, DISABILITY AND AGE . . . ."

(Compl. heading VII.)  Group Health responds in the instant motion by arguing, with

citations to evidence in the record, that Ms. McDaniels cannot show that Group Health

subjected her to any adverse employment action on the basis of her age.  (Mot. at 21.)  In

her response brief, Ms. McDaniels does not address Group Health's arguments.  Instead,

she simply includes another heading:  "Under Title VII, WLAD age and Prima Facie

Case."  (Resp. at 4.)  Accordingly, the court finds there is no genuine issue of material

fact and Group Health is entitled to summary judgment on Ms. McDaniels' age

discrimination claim.

### 5.  Negligent Supervision

To prevail on a claim of negligent supervision in Washington, a plaintiff must

show that (1) an employee of the defendant acted outside the scope of her employment,

(2) the employee presented a risk of harm to others, (3) the employer knew or should

have known in the exercise of reasonable care that the employee posed a risk to others,

1   and (4) the employer's failure to supervise the employee was the proximate cause of the

2   plaintiff's harm.  *Briggs v. Nova Servs.*, 147 P.3d 616, 622 (Wash. Ct. App. 2006) (citing

3   *Niece v. Elmview Group Home*, 929 P.2d 420 (Wash. 1997)).  Ms. McDaniels appears to

4   base her negligent supervision claim on the theory that Group Health failed to adequately

5   train Ms. Wood, and as a result Ms. Wood disciplined Ms. McDaniels in an allegedly

6   discriminatory manner.  (*See* Compl. ¶ 16; Resp. at 9.)  As Group Health points out,

7   however, Ms. McDaniels has neither alleged nor provided any evidence that Ms. Wood

8   acted outside the scope of her employment when she disciplined Ms. McDaniels.  (*See*

9   Mot. at 29; Reply at 14.)  Moreover, the court has already found that Ms. McDaniels has

10  not created a genuine issue of material fact regarding racially discriminatory treatment by

11  Group Health and Ms. Wood.  As such, Group Health is entitled to summary judgment on

12  Ms. McDaniels' negligent supervision claim.

13          6.  Breach of Contract

14          Ms. McDaniels addresses this claim only once, with a single sentence.  In her

15  complaint, she states that she "had an actual or implied employment contract with the

16  Defendants, and the Defendants[] unlawfully breached their employment contract with

17  the plaintiff, and wrongfully terminated her."  (Compl. ¶ 20.)  Group Health argues that

18  this claim should be dismissed for failure to satisfy the pleading standards laid out in

19  *Ashcroft v. Iqbal*, 566 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550

20  U.S. 544 (2007), because it amounts to a mere recital of the elements of a cause of action.

21  *See Iqbal*, 566 U.S. at 678.

22

1    Ms. McDaniels has not responded to Group Health's argument.  Moreover, the

2  deadline for amending pleadings has passed, and allowing amendment now, only one

3  month before the trial date, would significantly prejudice Group Health.  (*See* Minute

4  Order Setting Trial Dates and Related Dates (Dkt. # 12) at 1 (setting deadline for

5  amended pleadings at June 4, 2014, and trial date at December 1, 2014); *see also* Fed. R.

6  Civ. P. 15(a)(2).)  Furthermore, Ms. McDaniels admits that she had no employment

7  contract with Group Health (McDaniels Dep. at 301:13-303:21), and Washington adheres

8  to the "at-will" doctrine of employment law, *Ford v. Trendwest Resorts, Inc.*, 43 P.3d

9  1223, 1226 (Wash. 2002).  Consequently, the court grants summary judgment in Group

10  Health's favor on Ms. McDaniels' breach of contract claim.

11      7.  <u>Wrongful Discharge</u>

12    Washington law recognizes a narrow cause of action for wrongful discharge where

13  the discharge violates a clear mandate of public policy.  *See Renginer v. State Dep't of*

14  *Corrs.*, 951 P.2d 782, 787 (Wash. 1998).  To establish such a claim, a plaintiff must show

15  (1) a clear public policy, (2) that discouraging the plaintiff's conduct would jeopardize

16  the public policy, and (3) that the plaintiff's public-policy-linked conduct caused the

17  dismissal.  In addition, (4) the defendant must not be able to offer an overriding

18  justification for the dismissal.  *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 125 P.3d 119,

19  125 (Wash. 2005).  Ms. McDaniels' wrongful discharge claim is hardly a model of

20  clarity; however, she appears to assert the following: (a) that the FMLA, the ADA, and

21  the WLAD evince a clear public policy in favor of medical leave and the accommodation

22  of disabilities; (b) that she was fired for seeking leave and an accommodation; and (c)

1    that allowing her termination to go unpunished would jeopardize the public policy behind

2    the FMLA, the ADA, and the WLAD.  (*See* Resp. at 10.)

3          Even under that generous interpretation of her submissions to this court, Ms.

4    McDaniels' wrongful discharge claim fails.  The court has already found that Ms.

5    McDaniels has not created a genuine issue of material fact regarding whether she was

6    fired for taking FMLA leave or seeking an accommodation for her disabilities.  That

7    finding destroys an essential element of her wrongful discharge claim, and she presents

8    no new evidence in the context of this claim to warrant altering that finding.  Therefore,

9    Group Health is entitled to summary judgment on Ms. McDaniels' wrongful discharge

10   claim.[18]

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   _____

21         [18] Group Health asserts that this claim should be dismissed for several additional reasons.

22   (*See* Reply at 15-16.)  The court expresses no opinion on the merits of those arguments because
     it finds Ms. McDaniels' failure on the causation element sufficient to dispose of this claim.

### III.   CONCLUSION

For the foregoing reasons, the court GRANTS Defendant Group Health's motion for summary judgment (Dkt. # 13) and enters summary judgment in favor of Group Health on all claims before the court.  The court DENIES as moot the pending motions in limine (Dkt. ## 22, 23, 25).

Dated this 29th day of October, 2014.


JAMES L. ROBART
United States District Judge

ORDER- 32